UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN GRIFFITH, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>)<br>MICHAEL J. ASTRUE, )<br>)<br>    Defendant. )<br>) | No. 09-CV-10226-NMG |

REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR JUDGMENT

November 23, 2010

SOROKIN, M.J.

    The Plaintiff, Karen Griffith, moves pursuant to 42 U.S.C. § 405(g) for an order reversing an unfavorable decision by Defendant Michael Astrue, Commissioner of the Social Security Administration, and remanding her disability claim to the Commissioner for an award of benefits or in the alternative for further proceedings. The Commissioner moves for an order affirming his decision. For the following reasons, I RECOMMEND that Plaintiff's Motion to Reverse or Remand (Docket # 10) be DENIED and that Defendant's Motion for Order Affirming the Commissioner (Docket # 12) be ALLOWED.

**I.    FACTS**

    Mrs. Griffith was born in 1969. She demonstrated developmental difficulties by age 9, particularly in the academic setting (Tr. at 170). Her IQ was first tested at age 11, which showed that she functioned within the borderline range of intelligence (full scale IQ of 78) (Tr. at 185).

She was tested again at age 15 with similar results (full scale IQ of 76) (Tr. at 186). She then graduated high school, though she was a special needs student throughout this time (Tr. at 25-26). She went on to attend a non-degree program called the "Threshold Program" at Lesley College in childhood education. (Tr. at 26). The Threshold Program is geared towards adults with learning disabilities and lasts two years. Students who complete this program receive six college credits. Mrs. Griffith finished this program in 1990.

Beginning in 1987 (and until 2002) Mrs. Griffith worked as a day care worker for two distinct employers (Tr. at 133). After she quit her second day care job, she briefly worked as a shelf-stocker at a pharmacy in early 2003 (Tr. at 286.). Finally, she worked as a pre-school volunteer in 2007 (Tr. at 287). She has not worked since January 1, 2003 (id.). During this period, the relevant medical history begins.

While working in day care, in May of 1995, she told neurologist Dr. Betsy Sherry that she suffered seizures in 1990 and 1992. Accordingly, Dr. Sherry prescribed Tegretol (Tr. at 213). The only initial side-effect was a suspected rash, but this side-effect soon subsided (Tr. at 212). After continuing to take Tegetrol, Mrs. Griffith reported that she was seizure-free in December 1995 (Tr. at 211), January 1997 (Tr. at 210), March 1997 (Tr. at 209), and in June 1997 (Tr. at 208). In November 2003, 10 months after she ceased working altogether, she reported to Dr. William Griever that her last seizure was six years prior (Tr. at 254). This may have been a mistake, however, as Dr. Greiver reported to Dr. Donald Marks in 2004 that Mrs. Griffith's last seizure was in 1993 or 1994 (Tr. at 245). Mrs. Griffith saw Dr. Marks in November of 2006 and reported that she was seizure-free. Nowhere in the records of Mrs. Griffith's visits to any of the above-mentioned doctors is there any record of Mrs. Griffith suffering side-effects from the Tegetrol. In fact, Mrs. Griffith worked for 12 years following the

prescription of Tegetrol in 1995, eight of which were continuous, the years 1995 to 2002 (Tr. at 133, 286-287).

Karen Griffith filed an application for Social Security Disability Insurance ("SSDI") on October 26, 2006, claiming that she had been disabled since birth. Tr. at 17. The Social Security Administration ("SSA") denied this application on March 15, 2007. Id. Mrs. Griffith filed a Request for Reconsideration on May 14, 2007. Id. The SSA denied this request on February 6, 2008. Mrs. Griffith then requested a hearing before an Administrative Law Judge ("ALJ") on March 29, 2008. ALJ Joel Gardiner heard Mrs. Griffith's case in Boston, Massachusetts on September 16, 2008.

Following Mrs. Griffith's presentation of her claim for disability benefits, she underwent a psychological examination, conducted by Dr. Jeffrey Jampel in July 2007. She reported to Dr. Jampel that she completes household chores, buys groceries, rides public transportation alone, plays games with her children, visits various websites on the internet, and downloads games. She reported, however, that she was unable to open an EBay account due to her difficulty with numbers (Tr. at 287). Additionally, she reported that she could not balance her own checkbook. Dr. Jempel reported that she has some cognitive and memory difficulties and diagnosed her with Specific Reading and Arithmetic Disability (Tr. 290). It was his belief that she could be employed as long as the employment situation was tailored to her needs.

Mrs. Griffith underwent a second psychological evaluation in September 2007, conducted by Dr. Theodore Stronach. An IQ test revealed a full scale IQ of 64 (Tr. at 328). She reported to Dr. Stronach that she "has been careful to avoid stress which is another reason why she does not feel she could tolerate a job." (Tr. at 330). Dr. Stronach diagnosed Mrs. Griffith with Adjustment Disorder, Mild Mental Retardation, Seizure Disorder, and Psychosocial Stressors

(based on difficulty attaining disability benefits) (id.).  Nonetheless, Mrs. Griffith reported to Dr. Stronach that she had no problems with her basic self-care, has good family relationships, enjoys reading romance novels, walking, and spending time with friends.

Mrs. Griffith was evaluated by several additional reviewing physicians.  In February 2007, Dr. Bill Straub concluded that Mrs. Griffith's seizure disorder was controlled (Tr. at 284). In March 2007, Dr. Carol McKenna found that Mrs. Griffith had a learning disability, but that she was not sufficiently limited in her abilities.  Specifically, she found that Mrs. Griffith's learning disability is credible, but that Mrs. Griffith was able to comprehend and recall simple information, complete simple tasks, adapt to routine change following a period of brief adjustment, and was capable of adequate social interaction.  On January 4, 2008, Mrs. Griffith met with neurologist Dr. Gumbinas.  Dr. Gumbinas stated that Mrs. Griffith's seizure disorder is well-controlled and "is considered a non severe impairment" (Tr. at 331).  On January 30, 2008, Mrs. Griffith saw Dr. Barry Rudnick.  Dr. Rudnick found that her impairment did not meet a listing (Tr. at 332) and that she could perform simple repetitive tasks (Tr. at 332).

In seeking benefits, Mrs. Griffith relied principally upon the medical opinions of Dr. Griever from 2008.  Dr. Griever has treated Mrs. Griffith for roughly ten years, generally seeing her once per year for annual physicals (Tr. at 37). In May 2008, Dr. Griever opined that Mrs. Griffith would likely need to miss more than four days of work per month due to her impairment (Tr. at 358).  He also found that she was incapable of even "low stress jobs," that her seizures were likely to disrupt the work of co-workers, that she could not ride public transportation alone, and that she would need added supervision.  Additionally, he found that Mrs. Griffith suffered from dizziness as a result of her seizure medication.  Dr. Griever expressed these opinions in the

4

form of a multi-page check off the box form with a few supplemental fill-in phrases in the appropriate places on the form.

The ALJ denied Mrs. Griffith's application on October 31, 2008. The ALJ followed the requisite five-step evaluation process to determine whether Griffith's alleged impairments entitled her to benefits. See 20 C.F.R. §§ 404.1520, 416.920; Goodermote v. Secretary of Health and Human Services, 690 F.2d 5, 6-7 (1st Cir. 1982); Tr. at 8. At step one, the ALJ found that Griffith had not engaged in any substantial gainful activity during the period of her alleged onset date of January 1, 2003 through her last insured date of March 31, 2007. Tr. at 9; see 20 C.F.R. § 404.1520(a)(4).

Under the second part of the analysis, the inquiry is whether the claimant has any "severe impairments," which are those impairments that "significantly limit the physical or mental capacity to perform basic work-related functions." See Goodermote, 690 F.2d at 6; 20 C.F.R. 416.920(c). The ALJ found that the claimant had the severe impairment of borderline intellectual capacity. Tr. at 9. See 20 C.F.R. § 1521 et seq.

The third inquiry is whether any of the claimants impairments, in isolation or taken together, meet or medically equal one of the Listings in 20 C.F.R. § 404, Subpart P, Appendix 1; if so, the claimant is automatically found to be disabled without reference to steps four and five of the analysis. 20 C.F.R. §§ 404.1520(a)(4). Mrs. Griffith alleged that her impairments meet listing 12.05(c), which provides that:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C or D are satisfied.

***

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related function.

Although Mrs. Griffith had a tested IQ of 64 and the ALJ had found that Mrs. Griffith had the severe impairment of borderline intellectual capacity, the ALJ found that Mrs. Griffith did not meet or equal the requirements of Listing 12.05(c), relying on IQ tests conducted during Mrs. Griffith's youth and the expert testimony of Gerald Winkler, who testified that "none of the claimant's impairments, either singly or in combination, medically meet or equal the criteria of any listed impairments during the requested period." Tr. at 10.

Since the ALJ did not find Griffith to be disabled under step three, he proceeded to step four. Tr. at 11. At step four, the claimant's residual functional capacity must be compared to the requirements of any past relevant work. 20 C.F.R. § 404.1520(a)(4). The ALJ found that Griffith, through the date she was last insured, had the residual functional capacity to perform routine work at all exertional levels involving no work at unprotected heights; no work around hazardous machinery and no work requiring a driver's license. Id. at 11. Accordingly, the ALJ found that through her date last insured, Griffith was capable of performing her past relevant work as a day care worker, because this work did not require her to perform work-related activities precluded by the claimant's residual functional capacity. Id. at 14.

Additionally, the Administrative Law Judge ("ALJ") found Dr. Griever's findings "conclusory and against the weight of the record as a whole" (Tr. at 13). He further found that Dr. Griever's conclusions were not supported by any "medically acceptable signs, symptoms and/or laboratory findings." (id.). Moreover, he found that Mrs. Griffith's seizure disorder was clearly controlled by medication (id.). Finally, the ALJ found that Mrs. Griffith's daily level of activity undermines Dr. Griever's diagnosis of total disability (id.). The ALJ also noted that Dr.

6

Griever's diagnoses was inconsistent with that of other evaluating physicians and against the weight of the record as a whole (Tr. at 13).  Other evaluating physicians reported in 2006 and 2007 that Mrs. Griffith suffered no side-effects from her seizure medications (Tr. at 146, 159).

Mrs. Griffith exhausted her administrative appeals from the ALJ's decision and commenced this timely action for review under 42 U.S.C. § 405(g).

## III.   DISCUSSION

In this action, Griffith objects both to the ALJ's conclusions determined under steps three and four.  First, Griffith argues that her IQ falls within the range of mental retardation and therefore she meets Listing 12.05(c), contrary to the ALJ's finding under step three.  Second, Griffith argues that the ALJ's dismissal of her treating physician's opinion regarding her residual functional capacity without first recontacting Dr. Griever constituted reversible error, and calls into doubt his calculation of her residual functional capacity.

### A.   Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the Commissioner's decision (with or without remanding for rehearing) but the court may not disturb the Commissioner's findings where they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion.  Rodriguez v. Secretary of Health and Human Services, 647 F.2d 218, 222 (1st Cir. 1981).  Determinations of credibility and the resolutions of conflicts in the evidence are for the Commissioner and not for the doctors or for court.  Id.  Although an administrative record might support multiple conclusions, a court must uphold the Commissioner's findings wherever a reasonable mind, reviewing the record as a whole could accept it as adequate to support them.  Irlanda Ortiz v. Secretary of Health & Human Services,

955 F.2d 765, 769 (1st Cir. 1991). A denial of benefits, however, will not be upheld where there has been an error of law in the evaluation of the claim. See Manso-Pizarro v. Secretary of Health and Human Services, 76 F.3d 15, 16 (1st Cir. 1996). Similarly, a denial will not be upheld where the finding o the Commissioner is not supported by substantial evidence. Id.

Mrs. Griffith's appeal assigns error to the ALJ's decision at the third and fourth stages of the above inquiry, at which stage a claimant bears the burden of proving that her impairment or combination of impairments meets or equals the Listings or that she does not have sufficient residual functional capacity to complete past work. 20 C.F.R. § 404.1520(d); Dudley v. Secretary of Health & Human Services, 816 F.2d 792, 793 (1st Cir. 1987). To meet a listed impairment, the claimant's medical findings (i.e. symptoms, signs, and laboratory findings) must match those described in the listing for that impairment. 20 C.F.R. §§ 404.1525(a), 404.1528, 416.925(d), 416.928. To equal a listing, the claimant's medical findings must be "at least equal in severity and duration to the listed findings." 20 C.F.R. §§ 404.1526(a), 416.926(a). Determinations of equivalence must be based on medical evidence only and must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1526(b) 416.926(b).

> **B.      Substantial Evidence Supports the ALJ's finding that Listing 12.05(c) is inapplicable.**

As noted above, the ALJ concluded that "none of the claimant's impairments, singly or in combination, meet or equal the criteria of any listed impairments." Tr. at 10. Accordingly, the ALJ found that Mrs. Griffith does not meet the criteria for 12.05(c).

Mrs. Griffith argues that the ALJ failed to take into account her September 26, 2007 IQ test on which she received a full scale IQ score of 64. She further argues that this test should have resulted in the ALJ adjudicating her disabled *per se*.

8

Although an IQ of below 70 can result in a finding that a claimant meets the requirements of 12.05(c), the Listing requires that the intellectual deficit manifest itself "during the developmental period (before age 22)."  Listing 12.05, 20 C.F.R. Part 404, Subpart P, Appendix 1 (2008).  See also Wall v. Astrue, 561 F.3d 1048, 1062 (10th Cir. 2009); Morales v. Commissioner of Social Security, 2 Fed. Appx. 34, *37 (1st Cir. 2001).  Mrs. Griffith, on the other hand, was administered two IQ tests during her developmental period with full-scale results of 76 and 78.

Certainly, some courts have found that an IQ test subsequent to the developmental period that produces a result below 70 can create the presumption that the claimant's intellectual defect manifested itself during the developmental period.  See Mace v. Astrue, 2008 WL 4876857, *3 (D. Me. Nov. 11, 2008) ("absent evidence to the contrary, a person's IQ and/or condition of mental retardation is presumed to have been approximately constant throughout his/her life").  When no IQ tests prior to age 22 are available, other courts have relied upon additional evidence in the record other than the claimant's IQ score in order to establish evidence **"consistent with a finding that the plaintiff's mental retardation existed prior to finding that the plaintiff's mental retardation existed prior to age 22."**  Lombard v. Barnhart, 2003 WL 2246618 (D. Me. Oct. 31, 2003) (considering claimant's high school class rank and a psychological assessment that the claimant's "intellectual impairment is a chronic condition that will significantly limit his capacity to function").

Nevertheless, in all circumstances under which an ALJ or a reviewing court has used an IQ test administered after age 22 to determine that the claimant's mental deficiency manifested itself during the developmental period in accordance with the Listing, the ALJ or court has done so *in absence of* an IQ test relating to the claimant's intellectual capacity during the

developmental period. See Grenham v. Astrue, 2009 WL 1209026, *4 (2009) (citing cases). Here, however, the record reveals two IQ tests during the developmental period which are directly adverse to the conclusion that the claimant's alleged impairment manifested itself during the developmental period. Mrs. Griffith does not cite, nor is the court aware of, any case in which a claimant was found to meet Listing 12.05(c) despite record evidence of an IQ greater than 70 during the developmental period.

Moreover, perhaps the ALJ could find on the totality of the present facts (or perhaps supplemented by an expert opinion) that Mrs. Griffith's IQ was below 70 prior to age 22 in light of the below 70 score she received at age 38 combined with the other evidence in the case (including for example the special classes in which she was enrolled prior to age 22) despite the two above 70 scores from ages 11 and 15. However, the ALJ did not so find; rather, he pointed to the testimony of Dr. Gerald Winkler that none of the claimant's impairments met a listing (Tr. at 10). Substantial evidence supports this finding and, as noted, other courts have upheld similar findings. Thus, the ALJ's decision that Mrs. Griffith's defect did not manifest itself during the developmental period is supported by substantial evidence.

Even if Mrs. Griffith could show that her intellectual deficiency did manifest itself prior to age 22, substantial evidence supports the ALJ's decision that section 12.05(c) does not apply. In order to satisfy 12.05(c), a claimant must demonstrate that apart from her IQ score, she displayed a physical or other mental impairment imposing additional and significant work-related limitation of function." Mrs. Griffith argues that her well-documented seizure disorder fits this impairment.

Although the ALJ did not discuss this aspect of section 12.05(c) directly, his overall decision rejects the conclusion advanced by Mrs. Griffith. Mrs. Griffith has not had a seizure in

over fifteen years. She has been on anti-seizure medication during that period of time and the medical record supports the notion that the medication has been effective. At least one court has recently found that a seizure disorder that has been well controlled for seven years was properly held to be non-severe in the context of Listing 12.05. Miller v. Astrue, 2009 WL 2568571, *10-11 (N.D. N.Y. 2009). Mrs. Griffith also argues that the side-effects to the medication itself could be seen as an additional impairment. Specifically, Mrs. Griffith argues that the proscribed Tegetrol caused fatigue sufficient to constitute an additional impairment under 12.05. Nevertheless, such side-effects are not supported by the record. As discussed above, Mrs. Griffith made visits to numerous doctors throughout the mid and late 1990s, at times when she was taking anti-seizure medication. The only piece of the record that supports Mrs. Griffith's contention that she suffers side-effects from her anti-seizure medication is the report from Dr. Griever. However, the ALJ rejected that report. See infra. Therefore, I RECOMMEND that the court find that substantial evidence supported the ALJ's finding that Mrs. Griffith's condition did not meet or equal Listing 12.05(c).

### C. Substantial evidence supports the ALJ's finding that Mrs. Griffith had the residual functional capacity to complete relevant past work.

As noted above, at the fourth step of the disability analysis, the ALJ found that Mrs. Griffith was able to perform "simple, routine work at all exertional levels involving no work at unprotected heights; no work around hazardous machinery and no work requiring a driver's license." Tr. at 11. In making this finding, the ALJ relied on record evidence of Mrs. Griffith's daily life. Specifically, the ALJ noted that Mrs. Griffith is able to

> Take care for her personal needs, prepare meals, clean, do laundry and grocery shop [citation omitted]. She cares for her two children, transports them back and forth to school and she helps them with their homework. The claimant reports she rides a bike, she walks, she reads several hours a day and she does art projects

11

>daily with her children . . . does puzzles, she uses the computer on a daily baiss and she volunteers at a pre-school.

Tr. at 11-12.

Mrs. Griffith does not attack the finding that substantial evidence supports the ALJ's finding *per se*, but rather that the ALJ's methodology in arriving at that conclusion was faulty. Specifically, Mrs. Griffith alleges that in coming to a conclusion contrary to that of one of her treating physicians, Dr. Griever, the ALJ was obliged to re-contact Dr. Griever, which he did not do. Moreover, Mrs. Griffith argues that the ALJ gave insufficient weight to this treating physician's opinion that Mrs. Griffith would likely need to miss more than four days of work per month due to her impairment and that she was incapable of even "low stress jobs."

Specifically, Mrs. Griffith points to 20 C.F.R. § 404.1512(e) which provides that "when the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled . . . we will first recontact your treating physician . . . to determine whether the additional information we need is readily available." This regulation applies "'only where a lack of evidentiary basis for a treating source's opinion exists that makes the adjudicator unable to ascertain the basis of the opinion.'" Gaeta v. Barnhart, 2009 WL 2487862 at *5 (D.Mass. 2009)(Woodlock, J.)(quoting Conte v. McMahon, 472 F.Supp.2d 39, 49 (D.Mass. 2007)(Young, J.)). See also Carvey v. Astrue, 380 Fed.Appx. 50, 53 (2d Cir. 2010) (no obligation to re-contact where record is adequate); Lalime v. Astrue, 2009 WL 995575 at *6 (D.N.H. 2009) (no obligation to recontact treating physician when ALJ makes adverse credibility determination; rather duty to recontact exists only if information is inadequate to determine whether claimant is disabled). When, however, the ALJ disregards or rejects a treating physician's opinion, not due to confusion or lack of completeness, but rather

finding the opinion "not credible" in the face of evidence in the record, then the ALJ is "under no obligation to recontact" the treating physician. Id. at *6.

This is precisely that case. The ALJ made credibility determinations. The ALJ specifically found Dr. Griever's opinions "conclusory," "against the weight of the record as a whole," "not supported by medically acceptable signs, symptoms, and/or laboratory findings," and contrary to both a "fifteen year history of a seizure disorder which is clearly stable and controlled with medication" and a "daily reported level of activity and level of responsibility [which] undermine total disability." Tr. at 13. Accordingly, the ALJ "accorded diminished evidentiary weight" to the opinions of Dr. Griever. Id.

That the ALJ assigned greater weight to the expert physicians over the treating physicians is not reversible error and is permitted by the applicable regulations. The regulations permit an ALJ to find against a claimant based on expert medical evidence when the expert opinions are inconsistent with the opinions of a treating physician so long as the ALJ weighs the opinions in accordance with the factors laid out in subparts (a) through (e) of 20 C.F.R. § 404.1527. Id. at § 404.1527(f)(2)(iii). Although generally the ALJ must give more weight to treating sources, the ALJ may decline to do so if it is "inconsistent with the other substantial evidence in [the claimant's] case record." Id. at § 404.1527(d)(2).

Finally, "although the ALJ has a duty to develop the record, reversal of the ALJ's decision for failure to request additional information is warranted only where the ALJ's failure is unfair or prejudicial to the claimant's case." Graeta, 2009 WL 2487862 at *6 n. 4. Griffith has made no showing of unfairness or prejudice. For example, she has not demonstrated that additional evidence or clarification of Dr. Griever's opinions could have been produced, nor has

13

she requested (beyond the request for the ALJ to recontact) the opportunity to present additional evidence. This indicates that further evidence does not exist or is not helpful. Id.

IV. **CONCLUSION**

For the foregoing reasons, I RECOMMEND that the court AFFIRM the Commissioner's decision, and therefore ALLOW the Defendant's Motion (Docket #12) and DENY the Defendant's Motion (Docket #10). [1]

            /s / Leo T. Sorokin
            UNITED STATES MAGISTRATE JUDGE

---

[1] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).